No. 87-435

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

STATE OF MONTANA,

             Plaintiff and Respondent,

     -vs-

DENNIS FLOYD HAMMER,

             Defendant and Appellant.

---

APPEAL FROM:   District Court of the Twentieth Judicial District,
               In and for the County of Lake,
               The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Benjamin R. Anciaux, Polson, Montana

     For Respondent:

          Hon. Mike Greely, Attorney General, Helena, Montana
          Robert F.W. Smith, Asst. Atty. General, Helena
          Larry Nistler, County Attorney, Polson, Montana

---

                          Submitted on Briefs:   June 2, 1988

                               Decided:   July 25, 1988

Filed:   JUL 2 5 1988

_Ethel M. Harrison_
_____
            Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Dennis Floyd Hammer (Hammer) appeals his conviction in Lake County District Court of felony assault and misdemeanor assault. We affirm.

On December 31, 1986, New Year's Eve, Joseph Shanklin (Shanklin) of Polson, Montana, went to the Model Bar in Polson to celebrate the new year with some of his friends. Shanklin met Carol Hammer while at the bar. Carol Hammer related to Shanklin that she was having some problems with her "boyfriend" who had recently beaten her and that she was afraid she would be beaten again. Unknown to Shanklin at the time, Carol Hammer's "boyfriend" was actually her common law husband, Dennis Floyd Hammer. Shanklin assured Carol that he would not let her boyfriend beat her up again if he appeared at the bar.

Dennis Hammer later arrived intoxicated at the bar, approached Shanklin and Carol, and demanded that Shanklin leave. Shanklin refused to leave and Hammer suggested they "step outside." The two men exited the bar and argued but neither man threatened or touched the other. Shanklin re-entered the bar and Hammer did not follow him. Carol Hammer appeared relieved to Shanklin that her husband had not returned and asked Shanklin to remain nearby in case Hammer came back.

Shanklin later agreed to Carol's request that he walk her home after the bar closed. At the suggestion of the bartender, Carol and Shanklin accepted a ride to Carol's trailer home from an unidentified bar patron. Shanklin was concerned for Carol's safety and thought it was a good idea that he accompany her home for her protection. Upon arriving at her trailer, Carol invited Shanklin in.

Shanklin and Carol talked for about twenty to thirty minutes while Shanklin drank a beer. Dennis Hammer soon

2

returned home, unlocked the trailer door with his key, and entered the trailer to find Carol and Shanklin sitting at a table. Shanklin was surprised that Hammer had a key and was still unaware that Hammer was Carol's husband. Hammer demanded that Shanklin leave and, when Shanklin hesitated, Hammer picked up a large butcher knife from a kitchen counter. Hammer waved and slashed the knife at Shanklin while Carol screamed for Hammer to put the knife down. Shanklin eventually backed up to the trailer door, reached back, opened the door, and proceeded to back out of the trailer. As Shanklin backed out of the trailer, Hammer lunged forward with the knife. Shanklin tried to block the knife with his arm and received a deep cut to the bone on one of his hands.

Shanklin ran to the trailer next door and told one of the neighbors to call the police because he believed that Hammer would kill Carol. The neighbor called the police and Shanklin returned to the Hammer's trailer to see if Carol was all right. The trailer was quiet which led Shanklin to believe that Carol had been hurt. Shanklin entered the trailer and looked down a hallway to see Carol lying on a bed. Immediately thereafter, Shanklin heard the sound of a gun cock and saw Hammer round the corner of the bedroom door with a rifle in his hand. Shanklin again backed his way to the door and saw Hammer point the rifle in the direction of Shanklin's head. As he exited the trailer, Shanklin heard the gun discharge. The rifle shot entered the middle of the front door which was open inward into the trailer home and exited into a nearby television set.

Shanklin was headed for the neighbor's trailer for the second time when the first law enforcement officers arrived. Polson Police officers and Lake County Deputy Sheriffs were appraised of the situation by Shanklin. Shanklin told the law enforcement officers that he believed that Carol Hammer was in extreme danger because Dennis Hammer had beaten her

3

and had assaulted Shanklin with a knife and a rifle. Shanklin also informed the officers that Hammer was intoxicated. Law enforcement officers surrounded the trailer and used a bullhorn for approximately one hour with no response from the trailer. From Shanklin's explanation and the silence from the trailer, law enforcement officials feared that Carol Hammer was being held hostage or was injured. Approximately one and a half hours after they arrived on the scene, the officers forcibly entered the trailer.

The officers found Dennis and Carol Hammer sitting on the bed in a small bedroom. Hammer physically resisted when he was informed that he was under arrest. Carol also interfered with the arrest. During the commotion associated with Hammer's arrest, the officers noticed a bloody knife on a nearby dresser. The officers also noticed a Winchester .30-.30 lever action rifle in plain view just inside an open bedroom closet. Both the knife and the rifle were within close proximity of the bed and Hammer. The officers picked up the rifle while Hammer was still in the bedroom.

Law enforcement officers gathered evidence at the scene of the incident without first procuring a search warrant. Evidence gathered included the rifle, the knife, unspent .30-.30 cartridges, blood spots, bullet fragments in the exploded television set, and a bullet hole in the front door, among other items. After receiving medical treatment for his knife wound, Shanklin was transported to the Lake County Sheriff's office where he identified Hammer has his assailant.

On January 14, 1987, Hammer was charged by information with two counts of felony assault in violation of §§ 45-5-202(2)(a) and (2)(b), MCA. Hammer pled not guilty and, on March 16, 1987, moved to suppress all evidence in the State's possession procured during Hammer's arrest at his trailer home. The District Court heard arguments and denied

4

the motion on June 3, 1987. Prior to trial, the State moved in limine to exclude any evidence of alleged criminal acts committed by Shanklin several months after the incident in question. The District Court made the following ruling from the bench:

> [T]here shall be no inquiry into the charges [against Shanklin] after this incident unless the character of the witness Shanklin is brought before the jury in any form. If anybody says "this is a good guy" or "he's obviously credible" or if any comments are made by counsel or through questions from the State that "this is an outstanding, honest citizen," anything of that nature, that will open the door and I'll permit the defendant on cross-examination to delve into criminal matters that happened after the incident.
>
> In the absence of some evidence of any kind of good character on the part of the witness Shanklin then the defendant will be prohibited on cross from going into the criminal record that occurred after this transaction. (Additions ours.)

A jury trial was held on June 18 and 19, 1987, with the jury finding Hammer guilty of misdemeanor assault with a knife and felony assault with a rifle. On July 22, 1987, Hammer was sentenced to ten years imprisonment for felony assault, six months for misdemeanor assault, five years for the use of a dangerous weapon, and ten years additional imprisonment as a persistent felony offender. The two assault sentences are to be served concurrently with the five and ten year additional sentences to be served consecutively. Hammer was also designated a dangerous offender for purposes of parole eligibility. It is from the convictions and sentences that Hammer appeals and raises the following issues:

1. Did the District Court err in denying Hammer's motion to suppress evidence?

5

2. Did the District Court err in granting the State's motion in limine to exclude evidence concerning the victim's conduct several months after the accident?

3. Is there substantial evidence to support the verdict?

In his first issue, Hammer contends that the evidence obtained in this matter should be suppressed because there was no probable cause or exigent circumstances to justify his arrest without an arrest warrant. Without a valid arrest, Hammer argues, there can be no valid warrantless search. Sections 46-5-101, -102, MCA. The State relies on § 46-6-401(1)(d), MCA, to argue that law enforcement officers had "reasonable grounds" to believe that Hammer was committing an offense or had committed an offense and that "existing circumstances" required his immediate warrantless arrest. Section 46-6-401(1)(d), MCA, provides as follows:

> (1) a peace officer may make an arrest when:
>
> . . .
>
> (d) he believes on reasonable grounds that the person is committing an offense or that the person has committed an offense and the existing circumstances require his immediate arrest.

The terms "reasonable grounds" in the above statute are synonymous with probable cause. State v. Hamilton (1980), 185 Mont. 522, 528, 605 P.2d 1121, 1125, cert. denied, 447 U.S. 924, 100 S.Ct. 3017, 65 L.Ed.2d 1117. Hammer agrees that the above statute is applicable but asserts that the law enforcement officers lacked probable cause to arrest. There was no probable cause, Hammer suggests, because the crime occurred before the officers arrived and the scene of the crime was quiet after their arrival. Hammer asserts that probable cause to justify a warrantless arrest would have

6

existed only if the officers witnessed the offense. We disagree.

Shanklin communicated the following facts, among others, to law enforcement officers at the scene of the crime: (1) the man in the trailer (Hammer) stabbed and shot at Shanklin; (2) the man in the trailer was intoxicated; (3) Carol Hammer was recently beaten by the man in the trailer; (4) Carol Hammer was terrified of the man in the trailer and she believed he would beat her again; (5) Shanklin believed that Carol Hammer was in danger and was being held against her will. The officers personally observed Shanklin's injured hand and his excited and fearful demeanor. In addition, the officers received no response in their attempts to hail the occupants of the trailer with the bullhorn.

The State contends that Shanklin's report of the events of that morning, along with the officers' observations, form the basis for probable cause that an offense had been committed. The State characterizes Shanklin as a "citizen informant" to argue that it was reasonable for the officers to act upon his report. This Court recognizes the distinction between a mere informant and a citizen informant. State v. Flynn (1978), 176 Mont. 441, 578 P.2d 1165; State v. Leistiko (1978), 176 Mont. 434, 439, 578 P.2d 1161. In Leistiko we adopted the following relevant language from People v. Smith (Cal. 1976), 553 P.2d 557, 560:

> "A 'citizen-informant' is a citizen who purports to be the victim of or to have been the witness of a crime who is motivated by good citizenship and acts openly in aid of law enforcement . . . It is reasonable for police officers to act upon the reports of such an observer of criminal activity . . ."

Leistiko, 578 P.2d at 1164. Shanklin, as a victim and citizen informant, told the officers that a crime had been committed and that another crime was likely in progress.

7

From Shanklin's report and their own observations, law enforcement officials reasonably believed that Carol Hammer was injured and/or was being held hostage by Hammer. An officer may arrest without a warrant where the facts and circumstances within that officer's personal knowledge at the time of defendant's arrest would justify a man of reasonable caution to believe that an offense had been or was being committed. State v. Petko (1978), 177 Mont. 229, 233, 581 P.2d 425, 427-428 (citing State v. Lenon (1977), 174 Mont. 264, 570 P.2d 901). The facts of this case support the State's assertions that the officers had sufficient probable cause under § 46-6-401(1)(d), MCA, to justify a warrantless arrest.

Hammer next contends that exigent circumstances must have existed to justify his warrantless arrest at night in his home. Any exigencies, Hammer contends, were negated by the officers' hour and a half delay in making the arrest. According to Hammer, the officers should have obtained an arrest warrant while they waited.

The State urges this Court not to take a "hypertechnical" view of the situation presented to the officers in this case. The events occurred between the hours of 3:00 a.m. and 5:00 a.m. on January 1, 1987, a holiday. Law enforcement officials in this matter, as previously discussed, reasonably believed that a crime had been committed and that another crime might be in progress. The officers showed constraint and caution in a possible hostage situation for the safety of the occupants of the trailer and for their own safety. We recognize that the circumstances of a possible hostage situation such as presented here give rise to ongoing exigencies.

The situation was not defused and the officers were not out of danger, as Hammer contends, merely because time had passed by. One person, Shanklin, was stabbed and shot at and the officers reasonably believed that another, Carol Hammer,

8

had been beaten once and was in danger of being harmed again. In addition, the officers were faced with the ongoing exigency of the possible destruction of evidence. It was impractical and imprudent for any law enforcement officers to leave the scene and an immediate warrantless arrest was appropriate under the existing circumstances. Section 46-6-401(1)(d), MCA. We hold that the District Court did not err in denying Hammer's motion to suppress for lack of probable cause to make a warrantless arrest.

In its discussion of exigent circumstances, the State notes Welsh v. Wisconsin (1984), 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732, and State v. Ellinger (Mont. 1986), 725 P.2d 1201, 43 St.Rep. 1778, and recognizes that it has a heavy burden under the Fourth Amendment to the United States Constitution to justify warrantless felony arrests in a suspect's home. The State cites Welsh for the proposition that "an important factor to be considered when determining whether any exigency exists, is the gravity of the underlying offense for which the arrest is being made." Welsh, 466 U.S. at 753, 104 S.Ct. at 2099, 80 L.Ed.2d at 744. The underlying suspected offenses in this case were felony assaults and kidnapping which the State correctly identifies as offenses which enhance the exigencies involved.

Hammer's second argument for suppression of evidence is that the officers conducted an impermissible warrantless search. The State seeks to justify the search as an incidence to a lawful arrest and under the "plain view" doctrine. The controlling statutes on this issue, §§ 46-5-101 and 46-5-102, MCA, provide as follows in pertinent part:

> 46-5-101. Searches and seizures -- when authorized. A search of a person, object, or place may be made and instruments, articles, or things may be seized in accordance with the provisions of this chapter when the search is made:

9

(1) as an incident to a lawful arrest;

. . .

46-5-102. Scope of search incident to arrest. When a lawful arrest is effected, a peace officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of:

(1) protecting the officer from attack;

. . .

(4) discovering and seizing any persons, instruments, articles or things which may have been used in the commission of or which may constitute evidence of the offense.

In the instant case the officers were presented with a rifle, a large knife, and two people struggling against arrest in the confines of a small trailer home bedroom. Carol Hammer was not arrested and, given her actions in resisting Dennis Hammer's arrest, it was incumbent upon the officers to preserve evidence before they departed from the scene. In construing § 95-702, R.C.M. (1947), the predecessor statute to § 46-5-102, MCA, this Court adopted the following language from Chimel v. California (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685:

[I]t is reasonable for a peace officer pursuant to a lawful arrest to make a warrantless search of the area within the arrested person's "immediate control" construing that phrase to mean the area within which he might gain possession of a weapon or destructible evidence.

State v. Cripps (1978), 177 Mont. 410, 421, 582 P.2d 312, 318 (citing Chimel, 395 U.S. at 762-63, 89 S.Ct. at 2040, 23 L.Ed.2d at 694). Hammer contends that the weapons were not within Dennis or Carol Hammer's immediate control. We disagree. The small confines of the trailer home bedroom and

the resistance to arrest dictate that the evidence seized from the bedroom was within the immediate presence or control of Hammer. Pursuant to § 46-5-102(1) and (4), MCA, the officers were authorized to seize the rifle, the knife and other items without a warrant to protect themselves from attack and to preserve evidence "which may have been used in the commission of or which may constitute evidence of the offense."

The State also claims that the "plain view" doctrine justifies a warrantless search in this case. We need not address the State's argument in this regard in light of our determination that the warrantless search and seizure was justified on other grounds.

Hammer's second issue questions the District Court's exclusion of evidence regarding pending or resolved criminal charges existing against Shanklin for offenses allegedly committed sometime after the incident in question. Hammer sought to introduce this evidence to impeach Shanklin's credibility as a witness. Hammer argued at the lower court that such evidence was relevant and that any prejudice associated wtih the evidence did not outweigh probative value. The District Court ruled in the State's favor and excluded the evidence on the grounds that Rules 608 and 609, M.R.Evid., prohibit any inquiry into Shanklin's criminal record unless the State alluded to Shanklin's good character, truthfulness, or veracity.

Evidentiary rulings concerning the admissibility of evidence are within the District Court's discretion. Cooper v. Rosston (Mont. 1988), ____ P.2d ____, ____, 45 St.Rep. 978, 981; State v. Breitenstein (1979), 180 Mont. 503, 509, 591 P.2d 233, 236. We will not disturb a district court's ruling on the admissibility of evidence absent a showing of an abuse of discretion. Cooper, ____ P.2d at ____, 45 St.Rep. at 981. The presumption that a witness speaks the truth and is credible can be rebutted by evidence of a

11

"witness' character for truth, honesty, and integrity . . . "
Section 26-1-302(5), MCA. In Cooper we noted that evidence
bearing on the issue of a witnesses' credibility, in order to
be admissible, must be more probative than prejudicial.
Cooper, ____ P.2d at ____, 45 St.Rep. at 982. The District
Court must balance prejudice and probative value pursuant to
Rules 401 and 403, M.R.Civ.P. Cooper, ____ P.2d at ____, 45
St.Rep. at 981-982.

While we are convinced that criminal behavior is not
synonymous with impeccable credibility, the fact remains that
the District Court must still balance prejudice and probative
value. The evidence in question concerned events that
transpired several months after Hammer's assault on Shanklin.
Shanklin's alleged criminal conduct does not evidence a
propensity for violence which might support Hammer's
implication that Shanklin was the aggressor in this case. On
the contrary, Shanklin was charged with unlawful transactions
with minors, minor traffic offenses, and misdemeanor
possession of dangerous drugs and drug paraphernalia. Other
than the issue of Shanklin's credibility as a witness, the
evidence in question does not tend to make any fact at issue
in this action more or less probable than that fact would be
without the evidence. Rule 401, M.R.Evid. Hammer has failed
in his burden to show any abuse in the District Court's
discretion that the evidence in question was more prejudicial
than probative.

Hammer's final argument is that there is no substantial
evidence to support his conviction and that the District
Court should have granted his motion to dismiss at the close
of the State's case. The standard of review in substantial
evidence issues is "whether the evidence, when viewed in a
light most favorable to the State, is sufficient for a
rational trier of fact to have found the essential elements
of the crime beyond a reasonable doubt." State v. Crazy Boy
(Mont. 1988), ____ P.2d ____, 45 St.Rep. 1145, 1146. As was

12

the case in <u>Crazy Boy</u>, we have reviewed the record of this case and conclude that there is substantial evidence which satisfies the standard of review.

Hammer was convicted of misdemeanor assault and felony assault pursuant to § 45-5-201(1)(a), and § 45-5-202(2)(b), MCA. Section 45-5-201(1)(a), MCA, provides that a "person commits the offense of assault if he . . . purposely or knowingly causes bodily injury to another . . . " "A person commits the offense of felony assault if he purposely or knowingly causes . . . reasonable apprehension of serious bodily injury in another by the use of a weapon." Section 45-5-202(2)(b), MCA. Hammer contends that Shanklin's testimony could not form the basis for a finding of guilt because the testimony was inconsistent and because, as asserted in the previous issue, Shanklin's credibility was questionable.

The alleged inconsistencies related to Shanklin's recollection of how Hammer held the rifle and of Shanklin's position in the trailer home when Hammer shot at him. The State notes that Hammer's counsel emphasized to the jury, in cross-examination and closing argument, these alleged inconsistencies in Shanklin's testimony. The jury in this case was instructed that it was to "decide the issues of fact resulting from the charge or charges filed . . . " against Hammer. The jury was also correctly instructed that it is the sole judge of a witness' credibility pursuant to § 26-1-302, MCA. Finally, the jury was instructed that it may determine the weight to be given to a witness' testimony by considering, among other things, "[t]he extent to which

13

each witness is either supported or contradicted by other evidence in the case or may have previously said or done something inconsistent with his testimony in Court." From the facts and law presented in this case, the jury determined that Dennis Hammer was guilty of the offenses charged. From our review of the record it is apparent that a reasonable trier of fact could have concluded that Hammer was guilty of felony and misdemeanor assault.

Affirmed.

_____
Justice

We concur:

_____
_____
_____
_____
Justices

14